## TWEEDIE TRADING CO. v. STRONG & TROWBRIDGE CO.

(District Court, S. D. New York. November 1, 1907.)

SHIPPING—DEMURRAGE—DELAY IN DISCHARGING.

Where, by the terms of bills of lading for a cargo to be delivered at Takao, Formosa, the ship was entitled to commence discharging immediately on being ready and to proceed continuously at all such hours as the custom house or port authorities might give permission, the chartered owner was entitled to recover demurrage for delay caused by the failure of the consignee to furnish sufficient lighters or men; also, *held*, that the days of discharge were not confined to custom house hours where such hours were not, in fact, observed.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 44, Shipping, § 576.
Demurrage, see notes to Harrison v. Smith, 14 C. C. A. 657; Randall v. Sprague, 21 C. C. A. 337; Hagerman v. Norton, 46 C. C. A. 4.]

In Admiralty. Suit for demurrage.

Wheeler, Cortis & Haight and Ralph J. M. Bullowa, for libellant.
Daniel Nason and Edward G. Benedict, for respondent.

ADAMS, District Judge. This action was brought by the Tweedie Trading Company, the chartered owner of the steamship Myrtledene, to recover from the Strong & Trowbridge Company, a balance of certain demurrage on the steamer, claimed to amount to $6,225.96, said to be due by reason of the detention of the steamer at Takao and Keelung, Formosa, in October and November, 1904. On the 11th of March, 1904, the following contract was made between the parties:

"New York, March 11th, 1904.

Engaged for account of Strong & Trowbridge Co., who agree to ship per steamer of first class insurance, to make July shipment 1904, from Sparrows Point, Maryland, to Takao, Formosa, without transshipment, and The Tweedie Trading Co., Steamship Agents, who agree to furnish tonnage to suit freight room for about three thousand to thirty one hundred (3000 to 3100) tons, quantity at shipper's option, of steel rails and accessories, say bars, bolts, spikes, etc. * * * The Lighterage at Takao, if any, to be at the risk and expense of cargo. * * *

This contract is made subject * * * to terms of Bills of Lading in use by Steamers' Agents for regular lines to the East. * * *"

A similar contract was made for 300 tons of rails &c. for Keelung, dated March 14, 1904, supplemented by a freight engagement for 750 kegs of nails, dated May 10, 1904.

The forms of bills of lading referred to, when submitted for approval, contained the following typewritten clause in the margin: "Consignees to receive cargo at destination as fast as steamer can deliver", but this was stricken out by the respondent and the contract governing delivery was as follows:

"6.—Also, that the goods are to be received by the Consignee immmediately the Vessel is ready to discharge, and continuously at all such hours as the Custom House or Port Authorities may give permission for the ship to work, or if necessary to discharge into lighters at the risk and expense of the Consignees."

Under this contract, the steamer loaded, July 23rd, at Sparrows Point, Baltimore, Maryland, at the rate of about 600 tons per day, 10,642 steel rails, with angle plates, spikes and bolts, for Takao and 1,065

rails, with the plates &c. for Keelung. She proceeded first to Takao, where she arrived October 20th. She made her custom house entries on that day and was ready for discharge on the morning of the 21st, from which day she was at all times ready to discharge her cargo but did not succeed in getting it out until November 18th, when she sailed for Keelung and discharged her cargo for that place.

The main controversy is with respect to the considerable delay in discharging at Takao. It is possible that there may have been some slight delay at Keelung, but that has not been urgently pressed. The principal attention of the litigants has been given to Takao and it will not be necessary to consider the other place.

It appears quite clearly that owing to the Government demand for lighters, during the Russo-Japanese war, an insufficient number was supplied at Takao for the discharging of the steamer and such as were on hand for the purpose were frequently withdrawn to be used in connection with the loading of other steamers engaged in transporting war supplies, principally rice. Moreover, they were not sufficiently manned, which also caused some delay.

The steamer was ready at all times to discharge from all of her four hatches. An extra set of chain slings were supplied by the steamer at Takoa but that was a measure of precaution and the set was not needed.

The libellant urges that there should have been discharged 600 tons per day, but it was necessary that the steamer should lie in the open sea during the discharge, be subjected to such weather as should prevail, which several times made rough seas inimical to discharge, and that lighters should be used. This meant the loss of some time and it could scarcely be expected that the discharge would be as fast as the loading of the vessel, lying at a wharf in the protected harbor of Baltimore, where all the facilities of a well equipped establishment were available. It seems that if men and lighters had been supplied as they should have been, the discharge would have been about three times as fast as it was—about 80 tons per day—but I shall not pass upon this question. I will leave it to the commissioner to whom it is necessary to refer the matter, to determine this as well as the rate of demurrage and the number of days' detention.

The custom house hours were from 10 a. m. to 4 p. m., but that can not be considered as constituting a day, because the discharge actually commenced some days as early as 7 o'clock and continued to 6 o'clock. This may have been by permission or by custom but in any event, the days were not in practice confined to the custom house hours.

Decree for the libellant, with an order of reference.